[Nos. 18743-4-II; 19128-8-II. Division Two. July 12, 1996.]

*In the Matter of the Estate of* EDWARD D. LONG.

610

*Garold E. Johnson* and *Mann, Johnson, Wooster &
McLaughlin, P.S.*, for appellant.

*James V. Handmacher* and *Bonneville, Viert, Morton &
McGoldrick*, for respondent.

ARMSTRONG, J. — This consolidated action involves the interpretation of the wills of Thomas W. Long and his son Edward Long. The trial court held that certain stock left in trust pursuant to Thomas Long's will did not pass to Edward Long or his estate, but went directly to Edward's adult children. Edward's estate appeals this ruling. We affirm and hold that under Thomas's will, Edward was entitled to the stock only if he survived to the time of actual physical distribution of the assets.

In the second action, Edward's surviving widow, Laura, challenges the trial court's determination that under Edward's will, she must pay a proportionate share of the estate taxes together with interest from the date the taxes were paid by the estate. Again, we affirm.

## FACTS

Thomas W. Long and his wife Rita each owned 49 1/2 percent of the shares of Lakewood Refuse Service, Inc.

Their son, Edward Long, owned one share. In 1971, Thomas executed his will, establishing a trust, which included the Lakewood shares, for the support of his wife, Rita. Thomas's will provided:

2. Upon the death of my wife,

(a) The Trustee shall distribute all of my shares of the stock of Lakewood Refuse Service, Inc., unto my son, ED-WARD D. LONG, if he is living, it being my intention that he shall have sufficient share in said corporation to control its operation. If my said son is not living all of such shares shall be distributed as a part of the residue of the Trust.

(b) The residue of the Trust Estate shall be divided into six equal parts, one for each of my six children above named, and the share of each such child shall be distributed to him or her as soon as the Trustee can conveniently do so.

3. In the event that any of my said children predecease me or die before complete distribution of his or her share is made, and such deceased child is not survived by issue, such share, or the residue thereof, shall be distributed in equal shares unto my other children. If such deceased child is survived by issue, any of whom are not 21 years of age, the share of such child, or the residue thereof, shall be held, administered and distributed as a single trust for the use and benefit of all of his or her issue . . . .

Thomas died in 1972. In 1981, Lakewood redeemed Rita's shares. All the remaining shares, therefore, were owned by the trust with exception of Edward's single share.

In 1987, Edward and the other beneficiaries of Thomas's will entered into an agreement that modified Thomas's will. The agreement provided that Edward would receive 51 percent of the shares (or if sold, the proceeds) held in the trust; the remaining shares would be divided into five equal portions, one for each of Edward's siblings. The beneficiaries further agreed that if any one of them died before distribution, the deceased child's children, whether or not still minors, would receive the deceased child's share.

In January 1992, Edward and the trust sold all of the stock in Lakewood to a third party. A lawsuit was filed challenging the sale on issues unrelated to Thomas's will or the trust.

Because of the lawsuit, Edward, the trustee, and the third party purchaser entered into an escrow agreement in January 1992. The agreement provided that half of the sale price was to be dispersed immediately to the trust (the value of Edward's one share was distributed to him); the other half was to be held in escrow and distributed upon conclusion of the lawsuit.

Rita Long died on April 26, 1992, and half of the sale proceeds was distributed to Edward and the other beneficiaries according to the percentages established in the agreement. Edward died in July of 1993. The litigation over the stock sale then concluded in May of 1994.

At issue is the ownership of Edward's 51 percent of the second half of the sale proceeds that were still held in escrow at the time of Edward's death. Edward's daughters argue that Edward died before complete distribution of the shares (or proceeds) and they take the remaining shares as alternative beneficiaries under Thomas's will. Edward's widow argues that Edward's shares of the stock vested immediately and automatically in Edward at the time of Rita's death and, thus, became a part of Edward's estate in which she shares.

## ANALYSIS

### Time of Ownership by Edward

The question is whether Edward became the owner of Thomas's shares (or proceeds) immediately upon Rita's death, or whether Edward's ownership, even after Rita's death, was dependent upon actual physical transfer of the shares out of the trust.

██ In construing a will, the primary duty of the court is to determine the intent of the testator. *Matter of Estate*

*of Niehenke*, 117 Wn.2d 631, 639, 818 P.2d 1324 (1991). Intent must, if possible, be derived from the four corners of the will, and the will must be considered in its entirety. *McDonald v. Moore*, 57 Wn. App. 778, 780, 790 P.2d 213, *review denied*, 115 Wn.2d 1013 (1990). This court must determine Thomas's intent in drafting the provision that, upon the death of his wife, the trustee "shall distribute all of my shares of the stock of Lakewood Refuse Service Inc., unto my son, EDWARD D. LONG, if he is living, it being my intention that he shall have sufficient share in said corporation to control its operation."

In support of their argument, the daughters rely principally upon *Estate of Carlson*, 40 Wn. App. 827, 700 P.2d 771, *review denied*, 104 Wn.2d 1008 (1985). Carlson's will provided that half his estate be divided among three relatives subject to the following: "[i]n the event either Bertha Carlson or Nellie Carlson should predecease me or die prior to distribution of my estate, then the share of the sister-in-law so dying shall be divided equally between my nephew, John Burton Carlson and the remaining sister-in-law." *Carlson*, 40 Wn. App. at 829. Carlson died in August 1980 survived by Nellie. A partial distribution of estate assets was made in April of 1981. Nellie died in December of 1981, and the estate was ready to close in October of 1982. The court held that even though Nellie had already received a portion of her share of the estate, she died prior to distribution of the balance of the estate and was not entitled to any share of the remaining estate. *Carlson*, 40 Wn. App. at 831. In effect, the court held that Carlson's will required two events before Nellie could take a share: surviving Carl *and* surviving actual distribution of the assets from the estate. The will, therefore, contemplated actual physical distribution. *Carlson*, 40 Wn. App. at 831.

Edward's widow, however, relies upon the rule that early vesting of estates is favored, citing *In re Quick's Estate*, 33 Wn.2d 568, 206 P.2d 489 (1949); *In re Estate of Smith*, 40 Wn. App. 790, 700 P.2d 1181 (1985); and *Matter*

*of Booker*, 37 Wn. App. 708, 682 P.2d 320, *review denied*, 102 Wn.2d 1010 (1984). She also relies upon two out-of-state cases, *In re Newman's Estate*, 230 Cal. App. 2d 158, 40 Cal. Rptr. 785 (1964), and *In re Dimick's Will*, 531 P.2d 1027 (Okla. 1975).

In *Newman*, Leo Newman's will established a trust for his wife. *Newman*, 40 Cal. Rptr. at 786. Upon her death, he directed that the principal and all the accumulated earnings "shall be distributed as follows: . . . (1) One full share to decedent's brother, DR. MORITZ NEWMANN." *Newman*, 40 Cal. Rptr at 786. Moritz survived Leo's widow, but died before delivery of any part of the trust. The court held that "distribution" under the will was effective upon the death of Leo's wife. *Newman*, 40 Cal. Rptr. at 788. The court noted that to delay vesting until actual physical distribution of the assets would be to subject Moritz's interest to fortuitous and extraneous circumstances. *Newman*, 40 Cal. Rptr. at 788.

In *Dimick*, the will provided that at the end of the initial ten-year trust period, one-half of the trust estate was to be divided equally between Rosa and Dorothy, Dimick's daughters. *Dimick*, 531 P.2d at 1029. The will provided for alternative beneficiaries: "If at the time of distribution, following the initial ten-year period of such trust, either or both of my daughters shall then be dead, their children surviving them shall take the share of interest of my deceased daughter or daughters . . . ." *Dimick*, 531 P.2d at 1029. Upon the expiration of the initial ten-year period, the trust was in debt and no assets were distributed. Dorothy then died after this ten-year period but before the actual distribution of any trust assets. *Dimick*, 531 P.2d at 1029. The court held that Dorothy's share vested immediately upon expiration of the ten-year period, relying upon the general rule stated in 57 Am. Jur. *Wills* §§ 1250, 1251, at 827:

> Where a will provides that if a beneficiary dies before he has 'received' his legacy or before it has been 'paid' to him, it shall go over to others, the courts exhibit a strong tendency

to construe such a provision as referable to the time at which the legacy is *de jure payable*, rather than at the time the donee actually receives payment, *in the absence of a clear indication of a testatorial intention that the latter time be the operative one.*

*Dimick*, 531 P.2d at 1030.

While helpful in setting general guidelines, a review of these cases does not lead to any easy or compelling answer with regard to Thomas's intent. Each testamentary plan is unique, and testators may use the same words or phrases intending very different results. *Estate of Smith*, 40 Wn. App. at 795.

In this case, Thomas used the word "distribute" in three places. In paragraph 2(a), Thomas directed that the trustee "shall distribute . . . the stock . . . unto my son ED-WARD" upon Rita's death. In paragraph 2(b), the residuary clause, he stated, "the share of each such child shall be distributed to him or her as soon as the Trustee can conveniently do so." Finally, in paragraph 3, Thomas provided that "[i]n the event that any of my said children predecease me or die before complete distribution of his or her share is made."

As to Thomas's use of "distribute" in paragraph 2(a), nothing in the surrounding language suggests whether Thomas intended an automatic, de jure distribution or an actual physical distribution out of the trust. Paragraph 2(b), on the other hand, clearly contemplates the actual transfer of assets out of the trust since it authorizes the trustee to make distributions as the trustee "can conveniently do so." If Thomas had intended automatic de jure distribution, the discretion given the trustee to make distributions as convenient would be meaningless.

Paragraph 3 also contemplates an actual transfer of assets by "distribution" as opposed to an automatic, de jure distribution. If Thomas had intended an automatic, de jure distribution, he need not have qualified "distribution" with the adjective "complete distribution." Rather, the phrase "complete distribution" suggests that Thomas was

referring to the actual physical transfer of assets from time to time by the trustee out of the trust.

We recognize that paragraph 2(b) does not apply directly to the gift to Edward in paragraph 2(a); i.e., Edward's shares would go into the residue only if Edward were not living at the time of Rita's death. Nevertheless, because our inquiry focuses on what Thomas intended by the term "distribute," the language found in paragraph 2(b) is helpful. We must assume that he intended a consistent meaning of "distribute."

██ Further, if we accept the argument of Edward's widow, the "complete distribution" phrase in paragraph 3, which clearly means actual distribution from the trust, would apply only to paragraph 2(b) and not to paragraph 2(a). If so, Edward would take immediately upon Rita's death while his siblings would be required to not only survive Rita but survive actual distribution of the trust assets. Thomas's physical layout of the paragraphs suggests otherwise; we conclude that Thomas intended the language of paragraph 3 to apply to both paragraphs 2(a) and 2(b) of the will. Accordingly, we hold that, in order to take under the will, Edward must have survived until the time of actual physical distribution of assets. Because he did not, the trial court properly determined that Edward's adult children take under Thomas's will.

## Tax Apportionment

When Edward executed his will in December of 1981, Washington law provided that the residuary estate would bear the burden of federal estate taxes. *In re Heidner's Estate*, 7 Wn. App. 488, 490, 500 P.2d 1284, *review denied*, 81 Wn.2d 1008 (1972). Under Edward's will, his daughters each received specific bequests subject to federal taxation. Laura received the residuary and, if Edward had not provided otherwise, she would have borne the burden of paying federal taxes. Edward did provide otherwise in his will; he provided that each beneficiary should pay a share

of taxes in proportion to the share of the estate received by the beneficiary.

■ In 1986, after Edward executed his will, Washington adopted the Uniform Estate Tax Apportionment Act, RCW 83.110.010-.090. The Act provides that estate taxes shall be apportioned among all persons interested in the estate with an allowance made for tax exemptions, including the marital deduction. The Act, however, provides that the testator may provide for an apportionment scheme different than the one specified in the Act. RCW 83.110.020(1).

On appeal, Laura argues that Edward did not intend for her inheritance, subject to the marital tax exemption, to be burdened by taxes assessed against the daughters' inheritance. We, again, must look principally to the will to ascertain Edward's intent. *Anderson v. Anderson*, 80 Wn.2d 496, 499, 495 P.2d 1037 (1972).

Although the amount of the deduction has changed, the federal estate tax marital deduction has existed since the Revenue Act of 1948. 4 A. JAMES CASNER, ESTATE PLANNING § 13.1.2, at 2 (5th ed. 1988). Thus, when Edward executed his will in 1981 he could have provided that some or all of Laura's share of his estate would pass tax-free under the marital deduction. Edward chose not to do so. He clearly did not want Laura, as the residuary beneficiary, to pay all of the estate taxes due; but he also evidenced an intent that she pay *some* of the estate taxes due, i.e., a proportional share of the estate taxes. Although Washington law changed in 1986 with the adoption of the Uniform Tax Apportionment Act, the Act specifically reserved to a testator the authority to apportion tax liability in a manner other than as provided by the Act. Edward did not change his will after the adoption of this new Act; we can only assume that Edward still intended that Laura pay a proportionate share of the estate taxes.

Laura argues that requiring her to pay a portion of the taxes, in effect, means she is paying some of the daughter's taxes because she would be entitled under the marital deduction to receive her share tax free. The same argu-

ment, however, could have been made in 1981 when Edward executed his will. Laura would have been entitled then to receive some, or perhaps all, of her share of Edward's estate tax free because of the marital deduction. Edward's will tells us he intended otherwise.

## Interest on Taxes Paid

■■ Laura then contends that the trial court erred in ordering her to pay interest on her share of the tax liability previously paid by the daughters. She argues that the trial court is requiring that she pay prejudgment interest on an unknown and therefor unliquidated amount. We disagree.

The amount of federal estate taxes owed by Edward's estate is a known, liquidated amount. The parties disagree as to apportionment of this total tax payment. However, the mere fact that a claim is disputed does not render it "unliquidated," so long as the claim can be determined by reference to an objective source. *King Aircraft Sales, Inc. v. Lane*, 68 Wn. App. 706, 720, 846 P.2d 550 (1993). Furthermore, the court did not require that Laura pay any prejudgment interest; rather, she must pay interest only on her portion of the taxes already paid by the estate. Accordingly, we affirm the trial court.

MORGAN and TURNER, JJ., concur.